# UNITED ENGINE PARTS, INC., *Appellant,*
*v.*
## RIED et ux, *Respondents.*
### (TC 76-287-E, SC 25212)
584 P2d 275

D. F. Myrick, Grants Pass, argued the cause and filed briefs for appellant. With him on the briefs were Donald H. Coulter and Myrick, Coulter, Seagraves, Nealy & Myrick, Grants Pass.

Walter L. Cauble, Grants Pass, argued the cause and filed a brief for respondents. With him on the brief were Schultz, Salisbury, Cauble & Snider, Grants Pass.

Before Holman, Presiding Justice, and Howell, Bryson and Lent, Justices.

LENT, J.

**LENT, J.**

Plaintiff filed suit to foreclose a statutory possessory[1] lien on defendants' hay hauling truck to pay for the reasonable value of labor and materials provided by the plaintiff to the defendants[2] in repairing the truck. Defendant denied plaintiff's right to the lien and counterclaimed for damages for his loss of use of the truck for the short period during which the plaintiff withheld possession of the truck from the defendant pursuant to the asserted lien. The trial court, sitting as a court of equity, found for the defendant, both on plaintiff's suit and on defendant's counterclaim. The trial court awarded defendant $2,040 in damages. Plaintiff appeals and we modify and affirm.

The facts of this case are not only a nightmare but are of little interest to anyone but the litigants and their counsel. The case involves a 20-year-old flatbed hay hauling truck purchased by the defendant in October 1974 for $1,800. Defendant used the truck in his hay hauling business (buying hay in Klamath Falls and hauling it to Grants Pass for sale there). On December 31, 1974, the truck "broke down." Defendant sought bids for "overhauling the engine" from several sources and chose that of the plaintiff, which purported to be proficient in selling and installing truck engine parts, as the lowest bid.

Plaintiff purchased a reconditioned "short block"[3] and installed it in defendant's truck with the "accessory parts"[4] from the prior engine. On January 23,

---

[1] Why this suit is treated as one to foreclose a possessory lien is explained later in the opinion.

[2] Defendants are husband and wife and are joined as defendants by virtue of their joint ownership of the truck in question. Since the defendant wife played no active role in this case, further reference to "defendant" will be to the defendant-husband.

[3] The term "short block," as it was used by the witnesses in this case, appears to refer to the engine block itself with its internal parts; e.g., cylinders, pistons, rings, rods, crank shaft, cam shaft, etc., excluding "accessory equipment."

[4] "Accessory equipment" or "accessory parts" apparently refers to the engine parts not included in the "short block"; e.g., carburetor, alternator, generator, oil and fuel pumps, radiator, battery, fuel, oil and air filters, etc.

1975, the truck was delivered to the defendant, and a repair bill of $1,190 was tendered by the plaintiff and paid by the defendant. The short block itself carried a manufacturer's 90-day/4,000-mile warranty, and plaintiff gave the defendant an oral 90-day/4,000-mile express warranty on "parts and labor." Soon after the defendant got the truck back, he returned it to the plaintiff, complaining of low oil pressure and oil loss. Plaintiff examined the engine, found what appeared to be the problem, and "fixed" it. It appears that plaintiff tendered a repair bill to the defendant on February 28, 1975, that defendant refused to pay it, and that plaintiff, for whatever reason, marked it "paid."

According to the defendant, the mechanical problem persisted, and he took the truck back to the plaintiff several times. He continued to use the truck for hay hauling, however, making, according to defendant's records, 34 trips to Klamath Falls and back in 1975. On December 8, 1975, the truck again broke down. Plaintiff inspected the truck and estimated the cost of its repair at $150. The truck was towed to plaintiff's shop and on December 14, 1975, while upon plaintiff's premises was stolen and its engine completely destroyed. Plaintiff reported the loss to its liability insurance carrier, and was compensated for the actual cash value of the destroyed engine ($1,026.13). Plaintiff undertook to install a second "new" engine in defendant's truck.

Again plaintiff purchased a reconditioned "short block" with the same manufacturer's warranty and installed it with defendant's accessory equipment. Plaintiff tendered no repair bill, nor did defendant pay anything for the second engine. On January 10, 1976, plaintiff again delivered possession of the truck to the defendant, giving defendant an oral express warranty for 90 days or 4,000 miles for parts and labor.

On January 12, 1976, while returning from a run to Klamath Falls, the truck broke down for a third time—only two days and 550 miles after repair. Loss

of oil pressure and oil was the immediate cause. Plaintiff ordered a wrecker in Klamath Falls to tow the truck to plaintiff's shop and paid the towing charge. Plaintiff repaired the damage to the engine (without replacing the short block). This was referred to by the parties as the "third engine." No repair bill was tendered to the defendant, nor did defendant pay anything for these repairs. Plaintiff surrendered possession of the truck to the defendant on January 31, 1976.

After approximately 175 miles, on February 2, 1976, the truck broke down for a fourth time. Again the truck was towed to the plaintiff's shop, and again plaintiff undertook to repair the engine. This time, however, plaintiff installed an "oil cooler assembly"[5] in the engine to keep the oil heat down. Plaintiff claimed excessive oil heat was the "root source" of the problem; defendant, who had previously stated unequivocally to the plaintiff that he did not want the oil cooler installed, claimed that it added no value to the truck. When the defendant was notified that his truck was ready on March 3, 1976, he appeared at plaintiff's shop to take possession. At that time plaintiff tendered a repair bill to the defendant for $596.76. Plaintiff contended that this bill covered the parts and labor for the installation of the oil cooler assembly.[6] Defendant refused to pay the bill (or to acknowledge his duty to

---

[5]The oil cooler assembly, as described by the plaintiff's repairman, is a series of pipes which carry water from the radiator. The water pipes surround the oil pipes and cool the oil within to a temperature close to that of the water.

[6]Plaintiff's repairman testified that when defendant arrived on March 3, 1976, to pick up his truck, plaintiff's repairman presented him with two invoices, totaling $596.76, and introduced as plaintiff's exhibits 10 and 11. Although plaintiff's repairman testified this amount covered the installation of the oil cooler assembly, the exhibits indicate otherwise. Exhibit 11, in the amount of $472.65 and dated March 3, 1976, appears to cover the oil cooler assembly and parts incidental to its installation. Exhibit 10, on the other hand, in the amount of $124.11 and dated January 17, 1976, clearly does not cover anything connected with the oil cooler assembly. Its date and items listed indicate that it covered items installed on the *third* rather than the *fourth* engine, a fact to which plaintiff's repairman alluded in his testimony.

pay it). Plaintiff refused to relinquish possession and then tendered to defendant a repair bill in the amount of $3,364.30, which covered all work done on defendant's truck subsequent to the installation of the first engine on January 23, 1975. Defendant again refused payment and demanded possession. Plaintiff again refused to relinguish possession.

Faced with this impasse, plaintiff and defendant went to their respective counsel, who, on behalf of their clients, agreed that plaintiff would relinquish possession of the truck to the defendant and defendant in turn would pay $3,364.30 to the court and submit the respective claims on this fund (as if it were the truck itself) to judicial determination in the form of plaintiff's suit to foreclose its asserted possessory lien.

The agreement was effectuated on April 13, 1976, at which time defendant reacquired possession of the truck and deposited $3,364.30 in the court's registry. On April 15, 1976, plaintiff filed a suit in circuit court to foreclose the lien, alleging (1) plaintiff was in the auto repair business, (2) defendant hired plaintiff to make repairs on his truck and plaintiff made such repairs, (3) a reasonable charge for such repairs is $3,364.30, and (4) defendant has not paid such sum.

For answer, defendant generally denied plaintiff's substantive allegations and contended: (1) that the repairs were negligently done and of no value to the defendant, and (2) that they were covered by plaintiff's warranty and, therefore, there was no payment due. In addition, the defendant filed a counterclaim for damages for loss of use of the truck during the period from March 3, 1976, to April 13, 1976, during which time plaintiff withheld possession from the defendant. Defendant prayed for $650 damages for the reasonable rental value of the truck and $2,600 for lost profits during the period in question. Plaintiff replied with a general denial.

At trial the parties agreed, on the record, that the whole case was to be tried as an "equitable matter."

Witnesses for both parties testified to the historical facts outlined above, and various "experts" testified as to the real cause of the persistent problems with defendant's engine. Plaintiff's experts claimed that the "root source" was excessive oil heat caused by improper engine "configuration" and correctable by the oil cooler assembly installed by the plaintiff. Defendant's experts agreed that excessive oil heat and loss of oil were the immediate causes of the engine failure but that the antecedent cause of the oil problem was unknown. Defendant claimed that plaintiff had undertaken to "overhaul" his engine and that the problem was due to plaintiff's poor quality work. Plaintiff's repairman admitted that he had been asked by the defendant to "repair the problem, fix the problem."

The trial court found for the defendant. On the foreclosure suit, the trial court found that (1) all repair work was "warranty work," and (2) none of the work was of any value to the defendant. On the counterclaim, the trial court found that (1) plaintiff did not have a valid possessory lien and therefore its refusal to surrender possession to the defendant from March 3, 1976, to April 13, 1976, was unlawful, and (2) defendant was damaged by the loss of use of the truck for this period as follows: (a) $640 for reasonable rental value, and (b) $1,400 for lost profits. In connection with the latter finding, the trial court also found: (1) defendant could have made a net profit of $67 per trip and could have made 28 trips during the period in question; (2) defendant's net profit for 1975 was $1,400; (3) plaintiff had reason to know of the potential loss of profit; and (4) defendant was unable to find a suitable substitute truck during this period.

Plaintiff's appeal is based on four assignments of error, which attack the trial court's ruling on the lien in general and the ruling on the counterclaim in the following specifics:

(1) Plaintiff's possession of the truck from March 3, 1976, to April 13, 1976, was not unlawful;

[ 427 ]

(2) The claim for lost profits was insufficiently pleaded;

(3) The lost profits were not proved to a reasonable certainty; and

(4) Defendant was not entitled to recover damages for both reasonable rental value and lost profits.

■ The first issue confronting this court is the scope of review to be applied to the facts of this case. While possessory liens of the type asserted here ("artisan" or "mechanic") were creatures of the common law, *McDearmid v. Foster & Co.,* 14 Or 417, 423, 12 P 813 (1887); Restatement of Security § 61(a) (1941), their foreclosure was not authorized by the common law, Restatement of Security § 72(1) (1941). The present suit for foreclosure, then, is governed strictly by statute. *Tulloch v. Cochrum,* 115 Or 601, 607, 236 P 1045 (1925). ORS 88.010 provides, in pertinent part:

> "Except as otherwise provided by law, a lien upon * * * personal property * * * shall be foreclosed * * * *by a suit.* * * *"* (emphasis added)

Thus, the lien foreclosure was a suit in equity and upon appeal is to be tried anew upon the record. ORS 19.125(3).

We first consider plaintiff's equitable claim for judicial foreclosure of its asserted possessory lien. ORS 87.152 provides, in pertinent part:

> "A person who * * * supplies material for or performs labor on a chattel at the request of the owner * * * has a lien on that chattel in his possession for the reasonable * * * charges for his labor, materials or services, and he may retain possession of the chattel until those charges are paid."

In *McDearmid v. Foster & Co., supra,* 14 Or at 423, we held that the predecessor statute to ORS 87.152 was a restatement of the common law possessory lien for artisans and should be construed accordingly. Such a common law lien was lost, as against the owner, upon the voluntary surrender of possession by the lienor to

[ 428 ]

the owner, unless subject to an agreement otherwise. Restatement of Security § 80 (1941); L. Jones, Law of Liens § 745 (1894). As we stated in *Yellow Mfg. Accept. Corp. v. Bristol,* 193 Or 24, 39-40, 236 P2d 939, 946-47 (1951):

> "At common law, artisans, tradesmen, mechanics, and laborers, who received property for the purpose of mending, repairing, and improving its condition for hire, had a possessory lien on such property until the reasonable charges and expenses thereon were paid. But it is indispensable to the existence of a common-law lien that the party who claims it should have and retain an independent, exclusive, and continuous possession of the property; the right to the lien is based directly upon such possession. * * *
>
> "* * * * *
>
> "A common-law lien is lost by the lienholder voluntarily and unconditionally parting with possession or control of the property to which it attaches, and such a lien cannot be restored thereafter by resumption of possession. However, the possessory lien is not necessarily waived or destroyed as between the parties where there is an intention to preserve the lien, the lienholder only conditionally parting with the property, as where by special agreement he allows the owner to take the property into his possession without prejudice to the lien. But such a surrender of possession under such an agreement will destroy the lien as to third persons. * * *"

In the present case, plaintiff unconditionally surrendered possession to the defendant after the installation of each engine except the fourth. Therefore, if the lien is valid at all, it is valid only as to the labor and material supplied for the fourth engine. In addition, by the terms of the statute, the material and labor must be provided "at the request of the owner." In Exhibit A to plaintiff's complaint, the following labor and materials are listed:

> "Fourth engine: Crank kit and parts    $403.44
> Labor, 46 hours    460.00
> Oil cooler assembly    596.75"

[ 429 ]

Plaintiff testified that the first two items were for parts and labor to repair the engine, which was damaged when it broke down only two days and 175 miles after he had completed an engine overhaul, which in turn was necessitated by an engine breakdown occurring within two days and 550 miles of the prior overhaul. Obviously, plaintiff did not provide these materials and labor at defendant's request but because it was bound to provide them under its 90-day/4,000-mile warranty. The last item must be viewed from a different perspective. Actually, at the time defendant first demanded possession, plaintiff apparently would have been satisfied with the payment of this amount alone, and upon payment (or promise to pay) plaintiff would have surrendered possession to the defendant. Were the materials and labor involved in the installation of the oil cooler assembly provided at the request of the defendant? The burden of proof on this issue is on the plaintiff. Not only is it not sustained, but there is unequivocal evidence to the contrary. The defendant testified as follows:

"A: They [plaintiff's repairmen] told me the oil needed a cooler on it and I said no, that's not the answer to the problem.
"* * * * *

"Q: [by defendant's counsel] Okay. Then I think you just mentioned that you didn't want to have an oil coolant unit put on the truck, is that right; they talked about one and you said don't put it on?
"A: I told them that wasn't the answer to the problem.
"* * * * *

"Q: Now when you took it back that time, the time before they installed the fourth engine, do you recall any discussion with anyone concerning an oil cooler assembly that wasn't solved?
"A: No, sir, not at this time. Maybe perhaps at a later time. I did go in there and they discussed they were going to put an oil cooler on there. I specifically stated it was not the problem, the problem was they were not putting the engine together proper in my opinion. I did

not approve this oil cooler, I did not tell them to put it on there.

"* * * * *

"Q: I think we covered that Mr. Ried and we're talking only about the last engine that was installed, and I'm specifically asking you if there was any discussions concerning this oil cooler assembly?

"A: No, sir, not to the details where I approved of it."

■ We find that the plaintiff failed to prove that the labor and materials for the fourth engine were provided at the request of the defendant as required by ORS 87.152, and therefore plaintiff did not establish its right to a lien.

Defendant's counterclaim was clearly one of a legal rather than equitable nature. Ordinarily, in such a case we are bound by ORS 17.435 and Art. VII (Amended), § 3, of the Oregon Constitution to affirm the trial court's findings of fact "unless this court can affirmatively say there is no evidence to support the verdict." As indicated previously, however, the parties agreed that the case was to be tried "as an equitable matter." What effect, if any, does that agreement have upon our scope of review? This issue is a difficult one, with potential ramifications well beyond the case at bar. *Compare* special concurring and dissenting opinions in *Oregon Farm Bureau v. Thompson* (on rehearing), 235 Or 162, 199-200, 884 P2d 182 (1963). Since it was neither raised nor briefed by the parties, however, its resolution will have to await a proper case. Under either scope of review, we find the trial court is to be affirmed in its determination that plaintiff was liable to defendant for damages for plaintiff's wrongful detention of defendant's truck.

■ The lien prescribed by ORS 87.152 expressly grants the lienor the right to retain possession of the chattel; however, since the plaintiff did not qualify for the protection afforded by ORS 87.152, its failure to surrender possession to the defendant upon demand was unlawful and caused a substantial interference

with defendant's right to possess and use his truck; therefore, defendant is entitled to recover damages to compensate him for the loss of the truck.

The trial court's award of $2,040 in damages was expressly apportioned as $640 for the reasonable rental value of the truck during the period from March 3, 1976, to April 13, 1976, and $1,400 as lost profits from defendant's hay hauling business during that period. The issues raised by this award are whether defendant is entitled to receive both measures of damages for loss of use and, if not, which of the two he is entitled to receive.

■■  The purpose of awarding compensatory damages is to make the party entitled thereto "whole." McCormick, Damages 560, § 137 (1935). Defendant's loss of use of his truck during the period in question would be compensated for by his recovery of *either* the reasonable rental value of a replacement truck to carry on his business *or,* if rental were not feasible, by net profits his use of the truck would have generated during the period in question. He could not recover both, because either makes him whole.

■  The trial court made a finding of fact that the defendant was "*unable* to find a suitable replacement truck during the period." (emphasis added) While the preponderance of evidence bears this out, our inquiry does not end there. The requisite element of proof is not the subjective *inability* of the defendant to find a substitute, but the objective *unavailability* of such a substitute. We construe this requirement to mean that the defendant must prove that a suitable substitute for the detained chattel was not reasonably available to him during the period in question.

Both parties offered evidence on this issue. Defendant called the proprietor of a truck rental agency in Grants Pass, who testified as follows:

"Q: [by defendant's counsel] Now, Mr. Simpson, during that period of time, March and April of 1976, did you have any flatbed trucks available?

[ 432 ]

"A: We have flatbed trucks, naturally not as large as the truck you're talking about, but we do have them.

"Q: Do you have any trucks that were equipped to haul hay?

"A: Not as such. They're flatbed trucks. You could use them for hay. They don't have the rack over the top like a regular hay truck has. You couldn't haul as much, they're a smaller truck than what he had. The only possibility, if he would—if we were to rent a truck to him to haul that much, the only thing we'd have would be a truck and trailer combination which is actually more expensive than just the truck.

"Q: But you did not have any hay trucks as such available?

"A: No, there are no hay trucks for rent.

"* * * * *

"Q: [by plaintiff's counsel] Well, you did have a truck and trailer that would suffice for hauling hay if he had asked for it, is that right, Mr. Simpson?

"A: Yes.

"Q: And what's the load capacity of the truck that you have?

"A: That particular truck would run—has a gross vehicle weight of 22,000 pounds, be able to haul around 12,000 pounds of hay on it or whatever.

"Q: On the truck unit?

"A: On the truck.

"Q: How about the trailer unit?

"A: A trailer, you could haul probably another 8,000 pounds on a flatbed trailer.

"Q: And you had those available in March and April of 1976?

"A: Yes.

"Q: Mr. Ried didn't talk to you at that time?

"A: Not that I recall.

"Q: Okay. And are those your own vehicles or did you procure those from some other firm?

"A: I own them.

"Q: You own them. And it's true, is it not, Mr. Simpson, that in the Grants Pass and Medford area there's at least ten or twelve firms that rent trucks and—Hertz does, Crater Lake Ford does, Floyd's Rent

[ 433 ]

All, Crater Lake Texaco, am I giving you some of your competitors?

"A: Yes.

"Q: Barnetts, Ryder's Truck Rental, and Rogue Rental and the U-Haul has a number of outlets, does it not?

"A: They have outlets, they wouldn't, to the best of my knowledge other than I think Floyd Rentals might have one flatbed truck. They have moving vans, van type trucks, but flatbed trucks in this area are rare. Not too many of them.

"Q: The only thing about a van is it may cause you some inconvenience in the loading of it, but you could still haul hay with it?

"A: They generally don't; you could, I suppose. It would be very difficult to load it.
"* * * * *

"Q: [by defendant's counsel] You're the only one who rents flatbed trucks then?

"A: In Grants Pass as far as I know we're the only ones around that would have flatbed trucks available.

"Q: To haul hay, there would have had to been modifications for these trucks?

"A: No, they use them for hauling hay as far as that goes.

"Q: What about the cost of the trailer, Mr. Simpson, what would that cost?

"A: A trailer like that by the month is $210 a month.

"Q: In addition to the cost of the truck?

"A: Yeah, just a flat fee on a trailer, no mileage fee."

The defendant himself offered the following testimony on this issue:

"Q: [by defendant's counsel] Mr. Ried, did you make any—were you successful in getting any efforts to have someone else haul your hay?

"A: No. I had one load of hay that I hauled by Mr. King to feed my own livestock.

"Q: Were you successful in locating a substitute truck to use?
"* * * * *

"A: I was not able to get a hay truck to haul hay.

"Q: Would you tell the Court what kind of a truck you needed?

"A: I needed a truck to haul hay. Any other cargo you tie down on the side—lumber, what have you. On a hay truck you load the hay in such a manner, you go and you load this truck from the front, I mean you tie this truck down from the front to the rear and most trucks are not equipped—lumber trucks and any other truck is not equipped and you cannot haul hay legally any other way than tying it down from the front to the rear and no trucks are equipped with this, specifically type for hauling hay.

"\* \* \* \* \*

"Q: Mr. Ried, did you check with any of the rental agencies in the area?

"A: No.

"Q: Were you successful in locating a truck anywhere?

"A: No.

"Q: Did you know of anyone who had any hay trucks available?

"A: No.

"Q: Did you make any other efforts to, other than what you've testified to, to have someone else haul your hay or find some means of hauling your hay where you could make a profit?

"A: No, there was no—nothing available to my knowledge.

"\* \* \* \* \*

"Q: [by plaintiff's counsel] You look in the yellow pages of the phone book for truck renting establishments, Mr. Ried?

"A: No.

"Q: If I told you that there's at least nine, ten major companies in Medford area that rent trucks, would you be able to tell me that you are familiar with some one or more of those, Hertz, for example?

"A: Yes.

"Q: Ryder?

"A: Yes.

"Q: U-Haul?

"A: Yes.

[ 435 ]

"Q: You know about all those do you not?

"A: Yes.

"Q: But you made no endeavor to check in Medford for trucks?

"A: They don't have a hay truck.

"Q: Just answer my question, did you check with them?

"A: No.

"Q: So you really don't know what they had available or not available in March and April of 1976, do you, you didn't ask?

"A: From personal observation, I didn't have to ask.

"Q: But you didn't inquire even, did you?

"A: No, sir.

"Q: Rogue River Rentals in Grants Pass, I believe that is the gentleman who already testified this afternoon, isn't that right?

"A: Yes, sir.

"Q: Did you talk with him about renting that one truck?

"A: It was not adequate.

"Q: Did you talk to him about it?

"A: I didn't have to; I knew it wasn't adequate from my own personal observation.

"* * * * *

"Q: [by defendant's counsel] Mr. Ried, you indicated that the vehicle, the vehicles at Rogue River Rental were not adequate to use as a substitute. Would you tell the Court why they were not?

"A: Because of the tonage (sic) that I would have had to haul and I could not feasibly rent a truck to make a profit. They were not large enough and they were not the type of trucks built for hauling hay."

■ Defendant did not produce sufficient evidence to establish objectively that a substitute truck was not reasonably available to him during the period in question; therefore, he is not entitled to utilize the "loss of profits" approach.

■ Defendant is entitled to compensation for plaintiff's unjustifiable detention of the truck, however, and there was evidence to support the award of $640 made

by the trial judge. The truck rental agency proprietor called by defendant did testify that the reasonable rental value of defendant's own truck for the time period in question would amount to that sum.

The decree of the trial court, therefore, must be modified to delete the recovery for lost profits and to allow only recovery for the reasonable rental value of $640 on defendant's counterclaim. In all other respects, the decree of the trial court is affirmed.

Affirmed as modified.