Monte CARPENTER, Mary Carpenter, Rodney Carpenter, Teresa Carpenter, and Carpenter Dairy, Plaintiffs,

v.

LAND O'LAKES, INC., a Minnesota corporation, Cenex Ag, Inc., a Minnesota corporation, Cenex, LTD., a Minnesota corporation, Cenex/Land O'Lakes Agronomy Co., a Minnesota corporation, Land O'Lakes/Cenex Ag., Inc., a Minnesota corporation, Defendants.

Civil No. 94-1566-FR.

United States District Court, D. Oregon.

Aug. 27, 1997.

David F. Sugerman, Paul & Sugerman, P.C., Portland, OR, Dennis Messoline, Salem, OR, for Plaintiffs.

William Davis, Paul R. Xochihua, Hallmark, Keating & Abbott, P.C., Portland, OR, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRYE, District Judge.

The following constitutes findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## BACKGROUND

The three plaintiffs, Monte Carpenter, his wife Mary Carpenter, and their son, Rodney Carpenter, own the fifth plaintiff, Carpenter Dairy.[1] The Carpenters allege that the defendant, Land O' Lakes, Inc. (Land O' Lakes), delivered feed to the Carpenter Dairy prior to June 5, 1993, and this feed

---

1. Plaintiff Teresa Carpenter settled her claims on the eve of trial.

caused serious and widespread health problems in their dairy herd. The Carpenters allege five claims: breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, strict product liability, negligence, and fraud.

The case was tried to the court from June 10, 1997 through June 20, 1997. During the trial, the court granted Land O' Lakes' motions for a directed verdict against the Carpenters' fraud and negligence claims, against the Carpenters' request for punitive damages, and against a finding of causation from mycotoxins.[2]

## FINDINGS OF FACT

Since 1991, Land O' Lakes has sold to the Carpenters feed for dairy cattle consisting of rolled corn and barley. The Carpenters received a load of this feed every seven to thirteen days. The load of feed at issue here was delivered to the dairy on May 28, 1993 and was fed to the dairy herd within two feedings of its delivery. There was no visible mold in the feed at the time of its delivery.

Rodney Carpenter was primarily responsible for feeding the dairy herd. The herd was fed feed which was made by combining in a mixer wagon the rolled corn and barley purchased from Land O'Lakes with hay, soy bean meal, whole cottonseed, and a mineral supplement. A mixer wagon chopped the hay and mixed the other ingredients with the hay. Rodney Carpenter did not time the mixing process but judged by sight whether the hay was chopped sufficiently. The mixer wagon used at the dairy was not capable of chopping the hay into one-half inch or less lengths. The Carpenters stored the feed in a pile on the floor of a commodity barn. When Rodney Carpenter was preparing the total mix ration for the next feeding, he would use a front-end loader to scoop up the feed and dump it into the mixer wagon. A scale on the mixer wagon allowed him to measure the amount of the ingredients being added to prepare the total mix ration. The herd was fed twice a day. Rodney Carpenter did not recalculate the amount of the total mix ration

to make for each feeding until the number of cows to be fed changed by nine or ten.

In April of 1993, Dr. Patrick Randall, a nutritionist from Land O'Lakes, went to the dairy and spoke with Rodney Carpenter. Rodney Carpenter told Dr. Randall that the feed was not any good, and that the fresh cows[3] were going off their feed and drying up shortly after giving birth. Dr. Randall checked the ratio of ingredients that Rodney Carpenter was putting in the mix ration and determined that the amount of rolled corn and barley used in the mix was too high. In Dr. Randall's opinion, the ratio of ingredients in the mix was causing the fresh cows to go off their feed and to dry up. He suggested to Rodney Carpenter that he reduce the amount of rolled corn and barley used in the mix. Instead, Rodney Carpenter added a mineral supplement from Purina, another manufacturer, to the mix ration. He did not make any other changes in the mix ration when he added the mineral supplement to the mix—that is, he did not reduce the amount of rolled corn and barley in the mix.

By June 5, 1993, the feed delivered on May 28, 1993 by Land O'Lakes had a crust of mold and did not flow freely. Ledges and walls had formed within the feed pile due to the mold. Dairy farmers refer to this as "bridging." Rodney Carpenter examined the feed as he scooped it up with the front-end loader. He had seen this bridging in the feed a few days before the morning of June 5, 1993, but it did not cause him concern and he continued to feed the herd from the feed pile. Some of the cows had also started eating less, or had "gone off feed," a few days before June 5, 1993, but this fact also had not caused him concern. The cows had been fed the moldy grain for a few days before the morning of June 5, 1993.

On June 5, 1993, the Carpenters conducted an auction at the dairy farm in order to sell some unneeded machinery, some heifers, and some calves. After the auction had started, Rodney Carpenter asked Monte Carpenter to come to the barn and check on the herd. After the second request, Monte Carpenter

---

2. A toxin produced by a fungus, such as a mold.

3. Cows that begin to give milk after giving birth.

went to the barn and found many sick cows. Some could not walk; others appeared to be dazed; many were "ganted."[4] Monte Carpenter checked the feed pile and noticed a crust of mold on the pile. The Carpenters' veterinarian, Dr. Paul Jones, was summoned to treat the herd. Land O'Lakes sent a load of rolled corn and barley to replace the moldy feed in time for the afternoon feeding on June 5, 1993.

The Carpenters began buying cows to replace the sick and unproductive ones on June 8, 1993. All of the cows which had eaten the moldy grain, or the calves of these cows, had died or were sold by October of 1994. The herd that replaced the sick and unproductive cows does not have any of the health problems which manifested after the cows had eaten the moldy feed. After June 5, 1993, the cows which had eaten the moldy grain had the following problems: rumen acidosis, decreased milk production, abortions, problems with rebreeding, birthing calves which died within a week, and deaths.

Rodney Carpenter told John Rosecrans, a ruminant nutritionist, in June of 1993, that when the cows went off feed and their milk production dropped, he held the amount of rolled corn and barley in the mix ration constant and reduced the amount of hay.

Land O' Lakes had quality assurance goals for procuring raw ingredients. It sought to purchase corn which conformed to United States Department of Agriculture grade No. 2 and which had a maximum moisture level of 15.5%. The Land O' Lakes Rivergate mill, where the feed purchased by the Carpenters was produced, uses 300 tons of corn a day and cannot always procure corn which meets its quality assurance goals. If the raw corn does not meet these quality assurance goals, Land O' Lakes uses the corn but takes steps during the manufacturing process to improve the quality of the corn. Land O' Lakes also applied a mold inhibitor to its rolled corn and barley feed during the time at issue.

The Carpenters kept information on each cow on "cow cards." Mary Carpenter was the primary recorder of the information on the cow cards. The cow cards, sorted by the numbers assigned to each cow, were used and reused and contain inaccuracies and inconsistencies. The court finds that the cow cards were not changed by the Carpenters in an effort to increase their damages or to mislead the court, but the inaccuracies and inconsistencies lessen the probative value of these cards.

Both Rodney and Monte Carpenter suffered bruises when sick cows fell on them. Monte Carpenter also had a front tooth knocked askew. Neither received medical treatment for their injuries. They suffered little, if any, emotional distress associated with their physical injuries caused by the cows falling on them. Both men, however, suffered serious emotional distress, particularly because they believed that they would economically lose the family farm, but also because they cared for their animals. In addition, Rodney Carpenter's marriage ended, at least in part, because of the stress.

### CONTENTIONS OF THE PARTIES

The Carpenters contend that the quality of the feed was in breach of the manufacturer's warranties, was defective because it contained excessive moisture, mold and fines,[5] and because its ingredients included grain that had been heavily damaged by insects. The Carpenters further contend that the unfit feed caused widespread health problems in their dairy herd, including deaths, decreased milk production, spontaneous abortions, decreased fertility, staggering, and falls.

Land O'Lakes contends that its feed is composed of natural substances which vary from year to year and season to season, and that feed can mold. Land O'Lakes contends that dairy farmers should be aware of mold. Land O'Lakes further contends that any health problems of the herd caused by mold in its feed would be short-term in nature, and that the longer-term health problems were due to poor dairy management practices.

---

4. When a cow is ganted, she appears to have no body fat and to be dehydrated.

5. Broken fragments or tiny particles.

## CONCLUSIONS OF LAW

### 1. *Causation*

The Carpenters called three expert witnesses on the issue of causation: Dr. Paul Jones, the Carpenters' treating veterinarian; Dr. Robert Van Saun, an assistant professor and rural veterinary practice clinician at Oregon State University; and Dr. LeRoy Coffman, the former state veterinarian for the State of Oregon. Land O'Lakes contends that the testimony of these witnesses is not admissible under the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The subject of expert testimony must be knowledge derived through scientific methods. *Id.* at 590, 113 S.Ct. at 2795. The testimony must also be relevant to determining a fact at issue. *Id.* at 591, 113 S.Ct. at 2795–96. The focus of the inquiry is on the methodology, not on the conclusions. *Id.* at 595, 113 S.Ct. at 2797–98. Factors to be considered under the first part of the test are whether the theory or technique is generally accepted in the scientific community; whether it has been subjected to peer review and publication; whether it can be and has been tested; whether the rate of error is acceptable; and whether it resulted naturally from research conducted independent of the litigation or was developed expressly for purposes of testifying. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316–17 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). The court has reviewed the methods used by the experts to reach their conclusions. Although the experts called by Land O' Lakes dispute the ultimate conclusions of the experts called by the Carpenters, all of the experts called agree with the underlying theories, such as that mold can cause digestive upsets and abortions. The court finds that the testimony of the three expert witnesses called by the Carpenters is admissible.

■ The court finds that the Carpenters have proven by a preponderance of the evidence that the mold in the feed purchased from Land O' Lakes was a substantial factor in causing acute rumen acidosis in many of the Carpenters' dairy cows in early June of 1993. The court also finds that Rodney Carpenter's response to the cows going off-feed because of the mold, which was to reduce the amount of hay in the total mix ration, also was a factor in causing acute rumen acidosis, but this does not negate Land O' Lakes liability. This finding is supported by the testimony of the Carpenters' experts, Dr. Jones and Dr. Van Saun. Furthermore, some of the defense experts testified that moldy feed can cause a cow to go off-feed which can result in rumen acidosis. This episode of rumen acidosis lasted from approximately June 5, 1993 until June 21, 1993.

The court finds that the Carpenters have not proven by a preponderance of the evidence that mold in the feed purchased from Land O' Lakes caused the episodes of acute rumen acidosis which occurred from June 27, 1993 through July 5, 1993 and during two periods in October of 1993.

The Carpenters have proven by a preponderance of the evidence that Land O' Lakes' feed was the cause of the following health problems of the herd, either directly when the cows ate the feed, or indirectly due to rumen acidosis in early June of 1993 which resulted in: the death of six cows, which occurred in June of 1993; twenty-nine abortions, which occurred from June through September of 1993; thirty cows culled from the herd in June and July of 1993; decreased milk production from June through December of 1993; and deaths within a few weeks of birth of calves born from June of 1993 through February of 1994.

### 2. *Legal Theories*

The remaining legal theories of the Carpenters are breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and strict product liability.

■ ORS 72.3140 requires that goods be merchantable and fit for the ordinary purposes for which such goods are used. The ordinary purpose of feed sold by Land O' Lakes is to nourish dairy cows without making them ill. The court finds that the moisture level of the feed caused the mold spores

which were in the feed when it was delivered to the Carpenters to bloom into mold, and the mold in the feed caused the rumen acidosis episode in early June of 1993. Thus, the court concludes that the quality of the feed was in breach of the implied warranty of merchantability under ORS 72.3140.

■ ORS 72.3150 implies a warranty of fitness for a particular purpose if "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods...." Here, the Carpenters purchased "off the shelf" dairy feed from Land O' Lakes. The Carpenters did not request any special formula for the feed. The Carpenters even began using a mineral supplement from another manufacturer before the feed at issue was delivered and, thus, had stopped placing reliance on Land O' Lakes' nutritional expertise. Rodney Carpenter testified that he signed the feed contract with Land O' Lakes because of the price. The court concludes that the feed purchased by the Carpenters was not in breach of an implied warranty of fitness for a particular purpose because there was no *particular* purpose contemplated by the parties.

■ Under ORS 30.920(1), the seller of a product "in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition...." This liability is to be evaluated in accordance with the Restatement (Second) of Torts § 402A, comments a-m (1965). ORS 30.920(3). An unreasonably dangerous product is one that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary common knowledge of the community as to its characteristics...." Restatement (Second) of Torts § 402A, comment i.

Several veterinarians and dairy farmers, including Monte Carpenter, testified that competent dairy farmers know that moldy feed should not be fed to cows. The evidence reflects that Rodney Carpenter noticed bridging in the feed pile, indicating the

growth of mold, several days before he stopped providing the feed to the herd. The court concludes that the feed, once it became noticeably moldy, was not dangerous beyond that which would be contemplated by a dairy farmer with the common knowledge dairy farmers have concerning feed. Accordingly, the court dismisses the strict liability claim.

### 3. *Damages*

■ Compensatory damages are intended to make an injured party whole. *United Engine Parts, Inc. v. Ried,* 283 Or. 421, 432, 584 P.2d 275 (1978). Lost profits must be proven to a reasonable certainty. *Welch v. U.S. Bancorp Realty and Mortgage Trust,* 286 Or. 673, 704, 596 P.2d 947 (1979). The courts construe the term "reasonable certainty" as a reasonable probability. *Tadsen v. Praegitzer Indus.,* 324 Or. 465, 472, 928 P.2d 980 (1996).

Both Rodney and Monte Carpenter suffered minor physical injuries when sick cows fell against them. The Carpenters contend that once they establish that they suffered from physical impacts, they can recover for the emotional distress caused by all of the related events, including the economic loss caused by the impact, and are not limited to damages for emotional distress. Rodney and Monte Carpenter each ask for an award of $235,000 for noneconomic damages. Land O' Lakes contends that the emotional distress suffered by the Carpenters was their fear of economic loss, and not their fear of physical impacts, and thus cannot be awarded under the laws of the State of Oregon.

■ Oregon law generally adheres to the impact test and requires that there be a "direct accompanying injury to the person who suffers the emotional distress as a prerequisite to its compensability." *Saechao v. Matsakoun,* 78 Or.App. 340, 346, 717 P.2d 165 (1986). In *Saechao,* three siblings watched as their fourth sibling was killed when an automobile jumped a curb. Of the three survivors, the sibling who was also injured by the car could recover for the emotional distress of watching his sibling die, but the two uninjured siblings could not. Psychic injury without an impact is compen-

sable under three situations: (1) the emotional distress was severe and was *intentionally* inflicted; (2) the defendant had a responsibility to the plaintiff and *intended* to do the wrongful act with knowledge that the wrongful act would cause grave distress; and (3) the negligent act infringed on a legally protected interest apart from the distress. *Curtis v. MRI Imaging Servs., II,* 148 Or.App. 607, 614, 941 P.2d 602 (1997). In allowing recovery from the medical professionals for the emotional distress caused when a patient was confined during a medical procedure conducted by MRI Imaging Services II, the *Curtis* court stated:

> Here ... plaintiff did not suffer mental distress as a secondary consequence of some economic loss occasioned by defendants' negligence. That is, this is not a case in which defendants' negligence caused economic loss that, in turn, generated emotional distress. Rather, plaintiff's psychic distress, as alleged, was the direct consequence of plaintiff's physical confinement and the concomitant violation of his psychic integrity.

*Id.* at 622, 941 P.2d 602.

■ In the Carpenters' case, the three exceptions do not come into play. Although Land O' Lakes is a cooperative, and some or all of the Carpenters are owner-producers, the relationship between Land O' Lakes and the Carpenters was not the special kind of relationship described above. The emotional distress of all of the Carpenters was in a great part evoked by their fear of losing the family farm, an economic loss; however, Monte and Rodney Carpenter also suffered physical injuries when the cows fell against them. The emotional distress caused to Monte and Rodney Carpenter by the falling cows, if any, was minute in comparison to the trauma they both suffered for over a year while fighting the health problems of the herd because they feared that they would lose their land and their business. The court concludes that under the laws of the State of Oregon, the Carpenters are not entitled to damages for all of the emotional distress caused by the events taking place after the herd ate the moldy feed. The court awards $2,500.00 damages to each Monte and Rod-

ney Carpenter for the emotional distress related to the physical injuries which occurred when some of the cows fell against them.

The Carpenters ask for economic damages in the sum of $433,736.73, consisting of $420,800.00 in business losses, $7,827.00 in property damage to the barn, and $5,109.73 in veterinarian bills. While not conceding liability, Land O' Lakes argues that the health problems of the herd at the dairy caused between $24,891.00 and $40,867.00 in economic losses.

The court finds that the Carpenters have proven by a preponderance of the evidence that they suffered $7,827.00 in property damage to the barn caused when the cows fell and thrashed about.

■ Mary Carpenter testified that the total veterinary bill was comprised of payments to Oregon State University for necropsies and treatment of one cow, money spent on enzymes for treatment, and $3,441.00 paid to Dr. Jones during the first four months after the moldy feed was fed to the cows. Although some money paid to Dr. Jones was likely for services which he would have performed anyway, the court concludes that that amount would be balanced by the fact that the court is attributing liability to Land O' Lakes for abortions and calf deaths past the four-month period. Dr. Jones likely would have provided some services to attend to these problems. The court concludes that the Carpenters have proven by a preponderance of the evidence that they suffered an additional $5,109.73 in veterinary bills and will award them that amount.

A more difficult loss to calculate is the loss of profits through the loss of milk production, dead cows, and fewer healthy calves being born. Nonetheless, the court concludes that the Carpenters have proven their lost profits to a reasonable certainty.

■ The court declines to award damages based on the Carpenters' stated intent to build the herd up to 180 "milkers" because the court concludes that the Carpenters have not proven by a preponderance of the evidence that the herd would have increased to 180 milkers according to their plan. The court will calculate damages based on the

size of the herd on June 5, 1993, which is in dispute. Mary Carpenter testified that the dairy had 150 milkers; Rodney Carpenter testified that the dairy had 145 milkers; Monte Carpenter told Hirsch Pendell of the Oregon Department of Agriculture that he had 140 milkers; the damages expert for the Carpenters assumed that there were 120 milkers based on the cow cards showing 122 milkers; Dr. Huston assumed a total herd size of 178; and Dr. Darlington stated that there were 114 milkers. The court finds that the Carpenters are in the best position to know how many milkers were in the herd on June 5, 1993 and finds that the herd had 140 milkers on June 5, 1993.

The expert for the Carpenters calculated damages based on the assumption that all of the cows in the herd immediately stopped producing milk. He presents several scenarios based on the number of years of productive life left in a cow when she stops production. The damages that the Carpenters seek are based on the assumption that 200 cows lost a full three years of production, which is the average productive life of a dairy cow. This did not occur. The creamery received 7,665 pounds of milk from the Carpenters' dairy on June 5, 1993, the day the mold was discovered. On June 9, 1993, the creamery received 7,502 pounds of milk, and on June 12, 1993, it received 7,135 pounds of milk. Although the Carpenters purchased replacement cows on June 8, 1993, many were heifers which were not milking. Even when a replacement cow is a milker, it takes a while for the cow to get acclimated to its new environment before it returns to normal milk production. While some cows may have dried up, the entire herd had not.

The court concluded above that Land O' Lakes is liable for decreased milk production from June 5, 1993 through December 31, 1993, a total of 209 days. Dr. Huston, Land O' Lakes' expert on damages, testified that the average daily lost milk production per cow in the entire herd was 7.0 pounds. His calculation is not based on just the milkers, however, so it needs an adjustment. Monte Carpenter told Hirsch that the dairy had 140 milkers, 40 springers, 40 dry cows, and 30 heifers. The milkers were 56% of the herd.

Accordingly, the court will adjust the pounds per loss for the entire herd by 56% to yield 10.92 pounds lost per milker on average. The lost milk production is then calculated by multiplying 10.92 pounds by 140 milkers by 209 days, for a total loss of 319,519 pounds. At a price per pound of $0.1222, the loss from decreased milk production is $39,045.00.

Monte Carpenter testified that a top quality heifer costs $1,300.00, and that he had purchased 31 replacement heifers for a total of $36,000.00. The average cost of each was $1,161.00. The court will award damages for a replacement heifer for the following lost cows for which the court concludes Land O' Lakes is liable: 6 dead cows, 29 aborted fetuses, and 30 culled cows. While the court does not have the exact number of calves that died within a few weeks of birth, it finds that 10 is a conservative number and awards damages for 10 calves also. The court will assume that half of the 29 aborted fetuses and half of the 10 calves born dead would have been female so those 20 would be replaced with a heifer. The other 19, males, would have been sold for the sum of $150.00 each. Thus, the court awards damages for the replacement of 56 heifers at a cost of $1,161.00 each, for a total of $65,016.00. The amount awarded as damages for the loss of the sale of the male calves is $2,850.00. The Carpenters would have received $400.00 each for the culled cows, so $400.00 times 30 culls, for a total of $12,000.00, must be subtracted from the damages.

Thus, the total economic losses are $107,-848.73.

## CONCLUSION

The Carpenters shall prepare and submit to the court a proposed judgment for signature. Land O'Lakes shall have ten days from service of the proposed judgment to file objections to its form.