In re Timothy McBRIDE, Debtor.

No. 03–01787.

United States Bankruptcy Court,
D. Idaho.

Dec. 22, 2004.

Joseph M. Meier, Cosho, Humphrey, Greener & Welsh, Boise, ID, Attorney for Debtor.

Randal J. French, Bauer & French, Boise, ID, Attorney for Creditors Holtzes.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

While the old song suggests that discouraging words are seldom heard on the range, the Court in this case must resolve a dispute between cattle ranchers.

Debtor Timothy McBride sought relief under Chapter 11 of the Bankruptcy Code to reorganize his livestock operation. Creditors Charles and Helen Holtz filed a proof of claim in his bankruptcy case claiming amounts due as a result of Debtor's breach of a cattle lease. Debtor objected to the amount of Creditors' claim. At issue is whether Debtor may offset amounts he asserts Creditors owe him against Creditors' claim. After consider-

ing the evidence, testimony, and arguments of the parties submitted at an evidentiary hearing concerning this contest, the Court concludes Debtor is not entitled to an offset.[1]

### Facts

In December 1998, Debtor and Creditors signed a cattle lease, the term of which extended from December 1, 1998 to November 30, 2001. Ex. 1. In general, Creditors agreed to provide Debtor with breeding stock and bulls. Debtor promised to care for the herd. For his efforts, Debtor could keep the offspring, but he had to pay Creditors an annual payment of $3,350 at the beginning of each year, plus the difference between that amount and $67 for each cow leased at the end of each season. The parties seemed satisfied with their arrangement and Debtor's performance, because when the term of the lease neared an end, they orally agreed to extend the deal through November 2003.

The problems began in December 2002, when Debtor failed to make the $3,350 payment due for the 2003 season on time. Instead, at some point in January 2003, Debtor gave Creditors a check, but it "bounced." Creditors were offended by this development, and so in early February 2003, Creditors sent Debtor written notice that they had decided to terminate the lease because Debtor had not timely paid them. Creditors demanded that Debtor return their cattle.

Before Debtor returned the animals, hopefully to salvage the deal, Debtor instructed his attorney to send a letter to Creditors' counsel, suggesting some alternatives to terminating the lease. Ex. 6. Debtor made three proposals to Creditors in this February 13 letter: he offered to purchase the leased cattle; he proposed to make the late $3,350 payment and continue their original arrangement for the remainder of the season; or, if they insisted, Debtor indicated he would return the cattle to Creditors, but only if they paid him $21,240 to satisfy a lien he claimed in the cattle under Oregon law for his costs to care for the animals from December 1, 2002, through February 15, 2003. The letter itemized Debtor's expenses for pasture for 169 cows, hay for eighty cows, feed for six bulls, protein supplements for all of the animals, vaccinations for all of the animals, and labor for vaccinating the cattle. Debtor testified at the hearing that the vaccinations were done after the lease was renewed for 2003, but prior to Creditors sending him the notice of termination. According to Debtor, no new offspring were born during this time.

It appears Creditors at one point agreed to pay the lien Debtor asserted in order to get their cattle back, but the parties reserved their rights to assert any claims, counterclaims, and defenses against each other. *See* Ex. 2 (letter from Creditors' counsel to Debtor's counsel dated February 24, 2003). But, as it turned out, Creditors paid no amounts to Debtor, even though Debtor began to return the cattle to them. Debtor was unable to assemble and return all of the cattle immediately because the herd had been let out to graze over a large area. Ultimately, by March, Debtor had managed to locate 193 of the 249 cows that he had leased from Creditors, and he returned them in groups of approximately thirty cows on several different occasions. A brand inspector certified that 186 were returned, and Debtor testified that he returned another seven without the aid of a brand inspector. Of these seven, one cow died the day after it was returned. At the hearing, the parties

---

1. This Memorandum constitutes the Court's findings of fact and conclusions of law concerning this contested matter for purposes of Fed. R. Bankr.P. 7052 and 9014.

agreed that fifty-seven cows were never found and returned,[2] but despite Debtor's speculation concerning what happened to them, no persuasive explanation was presented as to when or how these cattle went missing, or their whereabouts.

Debtor filed his Chapter 11 petition on May 14, 2003. Docket No. 1. On September 9, 2003, Creditors filed a proof of claim for $50,400, based on the value of the leased cows Debtor failed to return. Debtor filed an objection to the proof of claim on September 1, 2003, Docket No. 106, in which he contests the number of missing cows and their value, and in which he asserts a right to an offset of $23,092.27 against Creditors' claim.[3] Creditors filed a response to Debtor's objection on September 8, 2003.[4] Docket No. 109. As mentioned above, the Court conducted an evidentiary hearing concerning Debtor's objection on November 23, 2003. After the evidence and testimony was submitted, the Court invited the parties to submit post-hearing briefs; both parties did so. Docket Nos. 130, 131.

At the hearing, several issues were resolved. Counsel for the parties agreed there were fifty-seven missing cows; that each cow should be worth $800; and that the amount of Creditors' claim would be $45,600 before any offset. In addition, Debtor admitted that he decided to vaccinate and care for the cattle in the manner that he did and that he was not acting at Creditors' direction. Finally, Debtor acknowledged that he had breached the parties' lease agreement; that his breach was sufficient cause for Creditors to terminate the lease; and that his claimed offset of $23,092.27 should be reduced by the $3,350 he failed to pay Creditors for the 2003 lease year, resulting in a total offset of $19,742.27. Only two significant issues remain for the Court's consideration: whether Debtor is entitled to an offset against Creditors' claim for his costs in caring for the leased cattle from December 1, 2002, to February 22, 2003; and, if so, the amount of the offset. Debtor contends that both the Oregon statutes and the equitable theory of unjust enrichment justify an offset. Creditors disagree.[5]

### Discussion

**A. Debtor may not recover from Creditors under Or.Rev.Stat. § 87.152 (2004).**

To support his claim that he is entitled to reimbursement from Creditors for the care he provided to the leased cattle, Debtor first points to Or.Rev.Stat. § 87.152. That law provides:

---

2. It seems determining the exact number of cows that were leased, and the number that are now missing, is not an easy task. Exhibit 6 shows that Debtor leased 249 cows. If so, Debtor's return of 193 cows (the 186 certified by the brand inspector plus another seven) would leave fifty-six cows missing. In his testimony, Debtor stated that he thought he had 243 leased cows in early 2003. If this is the case, the return of 193 cows would leave fifty missing. Given the realities of a rural ranching operation, if the parties are happy, the Court is also comfortable accepting their agreement that fifty-seven cows are missing.

3. In addition to the $21,240 Debtor asserted he was due in early February, *see* Ex. 6,

Debtor now figures he is owed an additional $1,857.27 for seven extra days of caring for the cattle, *see* Ex. 2.

4. Apparently, only the Court finds it odd that both Debtor's objection and Creditors' response to that objection were filed before the proof of claim. Neither party seems to think this is a problem; the Court presumes that Debtor and his attorney were given a copy of Creditors' proof of claim before it was actually filed. At any rate, no harm, no foul.

5. Since both Debtor and Creditors reside in Oregon, and all of the relevant events occurred there, the Court and parties agree that Oregon law controls.

A person who makes, alters, repairs, transports, stores, pastures, cares for, provides services for, supplies materials for or performs labor on a chattel at the request of the owner or lawful possessor of the chattel has a lien on that chattel in the possession of the person for the reasonable or agreed charges for labor, materials or services of the person, and the person may retain possession of the chattel until those charges are paid.

Or.Rev.Stat. § 87.152. Two elements of that statute merit close analysis here. First, the statute instructs that a person who pastures or cares for another's personal property should "retain possession of the chattel until those charges are paid." Second, the statute's protections extend only to one who pastures or cares for another's animal "at the request of the owner or lawful possessor of the chattel." *Id.*

 According to the courts, someone claiming a lien in chattels under Or.Rev. Stat. § 87.152 waives the right to any lien if he or she voluntarily surrenders possession of the chattel (or here, cattle). *United ed Engine Parts, Inc. v. Ried,* 283 Or. 421, 584 P.2d 275, 279–80 (1978). However, if the parties enter an agreement allowing the owner of the chattel to retake possession without prejudicing the lien, the claimant's rights in the chattel are preserved notwithstanding the claimant's lack of possession. *Id.*

Here, Debtor and Creditors had such an agreement. *See* Ex. 2. Creditors were aware Debtor claimed a possessory lien under Or.Rev.Stat. § 87.152, and the parties agreed the livestock would be returned by Debtor to Creditors with all of their legal rights to be preserved. Therefore, Debtor's lack of possession of the cattle at this time is not fatal to his claim under Or.Rev.Stat. § 87.152.

 Even so, Debtor's claim under the statute fails for another reason. Recall, Debtor did not vaccinate the leased cattle at Creditors' request. The same appears true for all the labor and services Debtor provided prior to returning the cattle to Creditors. In his testimony, Debtor admitted that he controlled the care of the leased cattle while they were in his possession, and that Creditors did not request that he vaccinate them. Debtor also testified that, in his November 2002 meeting with Creditors, they did not agree to reimburse him for any of the expenses that Debtor now asks them to pay. Because he did not pasture and care for the animals "at the request of the owner," Debtor may not assert a claim against Creditors under Or.Rev.Stat. § 87.152.

**B. Allowing Debtor an offset is not required to prevent any unjust enrichment.**

 In Oregon, a party is entitled to restitution to prevent the unjust enrichment of another. As one court explained:

A claim for restitution based on unjust enrichment is limited to what has 'actually been received and retained by the creditor for his own benefit.' ... Thus, an entitlement to restitution based on a theory of unjust enrichment depends on a showing, first, that a benefit was conferred and, second, that the benefit was unjust.

*Hitchcock v. Delaney,* 192 Or.App. 453, 86 P.3d 73, 76 (2004) (internal citations omitted). More specifically, "the elements of the quasi-contractual claim of unjust enrichment are 'a benefit conferred, awareness by the recipient that a benefit has been received and, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it.'" *Summer Oaks Ltd. P'ship v. McGinley,* 183 Or.App. 645,

55 P.3d 1100, 1104 (2002) (citing *Jaqua v. Nike, Inc.*, 125 Or.App. 294, 865 P.2d 442, 445 (1993)). *See also Safeport, Inc. v. Equip. Roundup & Mfg., Inc.*, 184 Or. App. 690, 60 P.3d 1076, 1085 (2002) (citing the *Jaqua* elements for a *quantum meruit* claim).

> For an injustice to be found, one of three things must be true: "(i) [sic] the plaintiff had a reasonable expectation of payment; (2) the defendant should reasonably have expected to pay; or (3) society's reasonable expectations of security of person and property would be defeated by nonpayment." 1 Corbin, Contracts § 19A (Supp [sic] 1992).

*Jaqua*, 865 P.2d at 445 (discussing the elements necessary to find a quasi-contract).[6]

With equity providing the guiding light, the Court perceives no injustice if Debtor is denied an offset under these facts. Debtor presented no evidence that he could reasonably expect to be paid for the services he provided or the expenditures he made to care for the leased livestock before returning them to Creditors. Indeed, given their past dealings, Debtor most likely vaccinated and fed the animals under an assumption that he would bear these costs, the lease would continue until November 2003, and the proceeds from the sale of any 2003 offspring would compensate him for any overhead expenses associated with maintaining the leased cattle.

Similarly, nothing in the record suggests Creditors should reasonably expect to pay Debtor. There is no evidence that Creditors reimbursed Debtor for such expenses in the past, nor, as indicated above, is there any proof that Creditors asked Debtor to vaccinate and feed the cattle for them. And while both parties likely intended that Debtor would care for the cattle while he possessed them, there is no evidence that Creditors expected to pay for such services. In fact, just the opposite is true. Creditors turned over their cattle to Debtor with the expectation that Debtor would care for and return the cows at the end of the lease term, along with a payment for their use during the year.

Presumably Debtor cared for the animals in the way he did so that they would produce healthy, valuable offspring. Moreover, to the extent that more than 2% of the leased cows died, the lease required Debtor to replace each animal lost with another cow of similar quality and condition. While his expenditures and labor obviously benefitted Creditors, who ended

---

**6.** While the terminology varies, restitution, unjust enrichment, *quantum meruit,* and quasi-contract are all labels related to the same legal theory, under which a person may, under appropriate circumstances, recover the value of the services provided to another under an implied contract. For example, the definition of *quantum meruit* in Black's Law Dictionary is instructive:

> **quantum meruit** ... At common law, a count in an assumpsit action to recover payment for services rendered to another person.... Quantum meruit is still used today as an equitable remedy to provide restitution for unjust enrichment. It is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff can recover even if the contract is unenforceable. See *implied-in-law contract* under CONTRACT.

Black's Law Dictionary 1276 (8th ed.2004). So, too, the discussion of an implied-in-law contract is also helpful:

> **implied-in-law contract.** A contract created by law for the sake of justice; specif., an obligation imposed by law because of some special relationship between them, or because one of them would otherwise be unjustly enriched.... An implied-in-law contract is not actually a contract, but instead a remedy that allows the plaintiff to recover a benefit conferred on the defendant.—Also termed *contract implied in law; quasi-contract; constructive contract.* See UNJUST ENRICHMENT.

Black's Law Dictionary 345–46 (8th ed.2004).

up with the cows, presumably Debtor was protecting his own financial interest in caring for the stock. That his financial goals were not realized was not Creditors' doing.

And Debtor has not argued, nor could he, that society's interests would be prejudiced by denying his offset claim under these facts. While the Court speaks reluctantly for the community, it is doubtful that society anticipates a lessor should pay for costs incurred by a lessee in performing a lease before (and especially after) that lessee breaches the lease. Instead, the Court suspects "society" would reject Debtor's attempt to invoke equity just to reallocate the inherent financial risks assumed by Debtor in connection with the parties' venture.

■ There is another reason that Debtor cannot prevail on his unjust enrichment theory. Although the lease does not expressly obligate Debtor to do so, Debtor testified at the hearing that it was his understanding that he was obligated to bear the costs of caring for the leased cattle while the lease was in effect. Under Oregon law, "there cannot be a valid legally enforceable contract and an implied contract covering the same services." *Prestige Homes Real Estate Co. v. Hanson,* 151 Or.App. 756, 951 P.2d 193, 195–96 (1997) (denying a real estate broker's *quantum meruit* claim because the listing agreement covered the defendant's obligations to the broker).

Here, neither party has challenged the validity of the lease. Debtor admitted he views the lease as requiring him to bear the costs to care for the leased cattle during the term of the lease. This admission undermines his request that the Court find an implied contract with terms contradictory to his understanding of the parties' valid, express contract. Therefore, Debtor cannot ask the Court to imply an obligation that Creditors pay Debtor's costs incurred prior to delivery of the animals to Creditors.

For these many reasons, Debtor is not entitled to any payment from Creditors for the care he provided to the leased cattle to prevent unjust enrichment.

### Conclusion

Debtor is not entitled to reimbursement from Creditors under either Or.Rev.Stat. § 87.152 or equity for his costs to care for the livestock before returning them to Creditors. He did not incur these expenses at Creditors' request, nor would it be unjust under these facts to impose the financial responsibility for caring for the leased animals while the lease was in effect on Debtor. Additionally, Debtor admitted the lease obligated him to care for the cattle while it was in effect. Because Debtor has no valid claim against Creditors, he is not entitled to an offset against their claim against him.

By separate order, Debtor's objection to Creditors' proof of claim will be overruled, and Creditors' claim will be allowed in the agreed amount of $45,600.